UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| **KEVIN JAMES DALCOURT** | : | **DOCKET NO. 15-cv-2476** |
| **VERSUS** | : | **JUDGE DOHERTY** |
| **JEFF WINDHAM, WARDEN, AND OFFICE OF 15th JDC DISTRICT ATTORNEY** | : | **MAGISTRATE JUDGE KAY** |

## REPORT AND RECOMMENDATION

Before the court is an application for a writ of habeas corpus pursuant to 28 U.S.C § 2254 filed by Kevin James Dalcourt ("petitioner"), who is represented by counsel. Doc. 1. The 15th JDC District Attorney ("respondent") opposes the application. Doc. 9.

This matter is referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636 and the standing orders of the court. For the following reasons **IT IS RECOMMEDED** that the application be **DENIED** and that the petition be **DISMISSED WITH PREJUDICE**.

### I.
#### BACKGROUND

*A. Conviction*

The petitioner was indicted on one count of forcible rape[1] in the 15th Judicial District, Lafayette Parish, Louisiana, on January 13, 2009. Doc. 9, att. 3, p. 47. The charge related to an

---

[1] The statute criminalizing forcible rape under Louisiana law has since been amended to redefine the offense as "second degree rape." LA. ACTS 2015, No. 256, § 1; *see* La. Rev. Stat. § 14:42.1(C). However, the elements of the offense remain unchanged.

-1-

encounter between the petitioner and L.R. ("victim"),[2] a mentally challenged fifteen-year-old girl who worked at his restaurant, on October 11, 2008. *Id.*; *State v. Dalcourt*, 2012 WL 1521465, *1 (La. Ct. App. 3d Cir. May 2, 2012) (unpublished). Following a jury trial, the petitioner was convicted of the charged offense by a vote of 10-2. Doc. 9, att. 6, pp. 234–36. He was subsequently sentenced to ten years' imprisonment at hard labor, with five years to be served without benefit of probation, parole, or suspension of sentence. Doc. 9, att. 7, pp. 136–37.

### B. Direct Appeal

The petitioner filed a direct appeal through counsel, raising multiple assignments of error. *Dalcourt*, 2012 WL 1521465 at *1–10. The Third Circuit reviewed these claims and denied relief. *Id.* The petitioner then sought review in the Louisiana Supreme Court, which review was denied on November 16, 2012. *State v. Dalcourt*, 102 So.3d 30 (La. 2012). He did not seek review in the United States Supreme Court. Doc. 1, p. 4.

### C. State Post-Conviction Relief

The petitioner filed an application for post-conviction relief, again through counsel, with the trial court on January 31, 2014. Doc. 11, att. 2, pp. 1–12. There he claimed that he received ineffective assistance from trial counsel based on several allegations of deficient performance. *Id.* The trial court denied the application without a hearing. Doc. 11, pp. 177–81. The petitioner sought

---

[2]Petitioner's counsel made no effort at all in his pleadings to protect the victim's identity. In federal court filings, parties are expected to redact the name of any individual known to be a minor. FED. R. CIV. P. 5.2(a). Pro se filings in § 2254 cases are exempt from this requirement, as are the official records of state court proceedings. *Id.* at 5.2(b). There is, however, no exemption for memoranda filed by counsel in § 2254 cases. Furthermore, this court's local rules require that, "[i]f the involvement of a minor child must be mentioned, only the initials of that child should be used," and applies to exhibits as well as all pleadings. LR 5.7.12. Here petitioner's counsel excerpts portions of the state record in his brief that include the petitioner's name in full on three occasions, as well as the name of another minor child living in the same household. Doc. 1, pp. 15, 17. Though respondent properly used only the victim's initials in his memorandum, he did not make any redaction to the record attached as an exhibit in this case. Accordingly, in a forthcoming order the clerk will be directed to seal the documents and exhibits in which then-minor children are identified. Counsel is cautioned that he is to take greater care in the future to adhere to these requirements.

review in the Third Circuit, which granted the writ and vacated the trial court's denial. Doc. 1, att. 7. Accordingly, it remanded the matter to the trial court for an evidentiary hearing. *Id.*

Following hearing the trial court again denied the application based on its finding that the petitioner had not demonstrate that trial counsel's actions constituted ineffective assistance. Doc. 1, att. 8, pp. 2–6. The petitioner once again sought review in the Third Circuit, which denied same, noting that the trial court had not erred in its denial of the application. Doc. 1, att. 9. The petitioner then sought review in the Louisiana Supreme Court and that review was denied on October 2, 2015, stating that the petitioner "[failed] to show he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 . . . (1984)." *State v. Dalcourt*, 175 So.3d 957 (La. 2015) (per curiam).

### D. Federal Habeas Petition

The instant petition was filed by counsel in this court on October 5, 2015. Doc. 1. Here the petitioner renews his ineffective assistance counsel claim from his state application for post-conviction relief, alleging three instances of deficient performance. *Id.*

## II.
### LEGAL STANDARDS ON HABEAS REVIEW

### A. Timeliness

Federal law imposes a one-year limitation period within which persons who are in custody pursuant to the judgment of a state court may seek habeas review in federal court. 28 U.S.C. § 2244(d)(1). This period generally runs from the date that the conviction becomes final. 28 U.S.C. § 2244(d)(1)(A). The time during which a properly-filed application for post-conviction relief is pending in state court is not counted toward the one-year limit. 28 U.S.C. § 2244(d)(2); *Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999). However, any lapse of time before proper filing in state court *is* counted. *Flanagan v. Johnson*, 154 F.3d 196, 199 n. 1 (5th Cir. 1998).

A state application is considered pending both while it is in state court for review and also during intervals between a state court's disposition and the petitioner's timely filing for review at the next level of state consideration. *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001). The limitations period is not tolled, however, for the period between the completion of state review and the filing of the federal habeas application. *Mayle v. Felix*, 545 U.S. 644, 644 (2005). Accordingly, in order to determine whether a habeas petition is time-barred under the provisions of §2244(d) the court must ascertain: (1) the date upon which the judgment became final either by the conclusion of direct review or by the expiration of time for seeking further direct review, (2) the dates during which properly filed petitions for post-conviction or other collateral review were pending in the state courts, and (3) the date upon which the petitioner filed his federal habeas corpus petition.

### B. Procedural Default and Exhaustion of State Court Remedies

Before proceeding to the merits of the issues raised in the petition, this court considers the doctrines of procedural default and exhaustion of state court remedies. Exhaustion and procedural default are both affirmative defenses that may be waived by the state if not raised in its responsive pleadings. *See, e.g.*, *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994). However, the federal district court may also consider both doctrines on its own motion. *Magouirk v. Phillips*, 144 F.3d 348, 357–59 (5th Cir. 1998). Therefore we consider any claims by respondent under these doctrines, in addition to conducting our own review.

#### 1. Exhaustion of State Court Remedies

The federal habeas corpus statute and decades of federal jurisprudence require a petitioner seeking federal habeas corpus relief to exhaust all available state court remedies prior to filing his federal petition. 28 U.S.C. § 2254(b)(1); *e.g.*, *Whitehead v. Johnson,* 157 F.3d 384, 387 (5th Cir.

1998). This is a matter of comity. *Ex parte Royall*, 6 S.Ct. 734, 740–41 (1886). In order to satisfy the exhaustion requirement, the petitioner must have "fairly presented" the substance of his federal constitutional claims to the state courts "in a procedurally proper manner according to the rules of the state courts." *Wilder v. Cockrell,* 274 F.3d 255, 259 (5th Cir. 2001); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). Each claim must be presented to the state's highest court, even when review by that court is discretionary. *E.g.*, *Wilson v. Foti*, 832 F.2d 891, 893–94 (5th Cir. 1987). Exhaustion is not satisfied if the petitioner presents new legal theories or entirely new factual claims in support of his federal habeas petition. *Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983).

In Louisiana the highest court is the Louisiana Supreme Court. *See* LSA–Const. art. 5, § 5(a). Thus, in order for a Louisiana prisoner to have exhausted his state court remedies he must have fairly presented the substance of his federal constitutional claims to the Louisiana Supreme Court in a procedurally correct manner, supported by the legal theories and factual allegations that he raises now. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).

### 2. Procedural Default

When a petitioner has defaulted a claim by violating a state procedural rule which constitutes adequate and independent grounds to bar direct review in the United States Supreme Court, he may not raise that claim in a federal habeas proceeding absent a showing of cause and prejudice or actual innocence. *Coleman v. Thompson*, 111 S.Ct. 2546, 2554 (1991). Failure to satisfy state procedural requirements results in forfeiture of a petitioner's right to present a claim in a federal habeas proceeding. *Murray v. Carrier*, 106 S.Ct. 2639 (1986). This is not a jurisdictional matter; rather, it is grounded in concerns of comity and federalism. *Trest v. Cain*, 118 S.Ct. 478, 480 (1997).

Procedural default exists where (1) a state court clearly and expressly bases its dismissal of the petitioner's constitutional claim on a state procedural rule and that procedural rule provides an independent and adequate ground for the dismissal ("traditional" procedural default)[3] or (2) the petitioner fails to properly exhaust all available state court remedies and the state court to which he would be required to petition would now find the claims procedurally barred ("technical" procedural default). In either instance, the petitioner is considered to have forfeited his federal habeas claims. *Bledsue v. Johnson*, 188 F.3d 250, 254–5 (5th Cir. 1999). The grounds for traditional procedural default must be based on the actions of the last state court rendering a judgment. *Harris v. Reed*, 109 S.Ct. 1038, 1043 (1989).

## C. General Principles

When a state court adjudicates a petitioner's claim on the merits, this court reviews the ruling under the deferential standard of 28 U.S.C. § 2254(d). *Corwin v. Johnson*, 150 F.3d 456, 471 (5th Cir. 1998). Section 2254(d) provides that a writ of habeas corpus shall not be granted unless the state court's adjudication on the merits resulted in a decision that was either (1) contrary to clearly established federal law or involved an unreasonable application of that law, or (2) based on an unreasonable determination of the facts in light of the evidence before the state court. 28 U.S.C. § 2254(d).

The first standard, whether the state court's adjudication was contrary to or involved an unreasonable application of clearly established federal law, applies to questions of law as well as mixed questions of law and fact. A petitioner must demonstrate that the "fair import" of the state court decision shows that the court failed to apply the controlling federal standard. *Early v. Packer*,

---

[3] To serve as adequate grounds for a federally cognizable default the state rule "must have been firmly established and regularly followed by the time as of which it is to be applied." *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (internal quotations omitted).

537 U.S. 3, 9 (2002) (per curiam). Furthermore, the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011). A decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth [by the Supreme Court], or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedents and arrives at a [contrary] result . . . ." *Bell v. Cone*, 543 U.S. 447, 452-53 (2005), quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotations omitted).

The second standard – whether the state court's adjudication was based on an unreasonable determination of the facts in light of the evidence – applies to questions of fact. It is insufficient for a petitioner to show that the state court erred in its factual determination but rather he must demonstrate that the factual determination was objectively unreasonable, a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S.Ct. 841, 849 (2010). Rather, the petitioner has to show that "a reasonable factfinder must conclude" that the determination of facts by the state court was unreasonable. *Rice v. Collins*, 546 U.S. 333, 341 (2006).

### III.
#### LEGAL ANALYSIS

As a preliminary matter this court reviews the petitioner's application for timeliness, failure to exhaust state court remedies, and procedural default. If the claim is procedurally viable, its merits are considered under the general standards set forth in Section II.C.

*A. Timeliness*

The petitioner's conviction became final on February 15, 2013, when his time for seeking review in the United States Supreme Court on direct appeal expired. *See* Sup. Ct. R. 13. Thus **350 days** accrued toward his one year limit before he filed his application for post-conviction relief on January 31, 2014. The limitations period remained tolled until October 2, 2015, when the Louisiana Supreme Court denied the petitioner's request for review of that application. An additional **3 days** accrued before the instant petition was filed on October 5, 2015. Accordingly, **353 days** have accrued against § 2244(d)'s one year limit and this matter is timely.

### B. *Exhaustion of State Court Remedies and Procedural Default*

The claims raised in the instant petition were exhausted and rejected on the merits in the state courts. Therefore no basis for procedural default exists.

### C. *Substantive Analysis*

Having determined that all claims are properly before this court, we now review them under the standards set out above. Because the trial court

As his sole basis for relief, the petitioner claims that he was denied his constitutional right to counsel due to alleged incidents of deficient performance by trial counsel, J. Lomax Jordan.

Claims of ineffective assistance of counsel are gauged by the guidelines set forth by the Supreme Court in *Strickland v. Washington*, 104 S.Ct. 2052 (1984). Under *Strickland*, a petitioner must demonstrate: (1) that his counsel's performance was deficient, requiring a showing that the errors were so serious such that he failed to function as "counsel" as guaranteed by the Sixth Amendment, and (2) that the deficiency so prejudiced the defendant that it deprived him of a fair trial or of a dependable verdict. *Id.* at 2064. The first prong does not require perfect assistance by counsel; rather, petitioner must demonstrate that counsel's representation fell beneath an objective standard of reasonableness. *Id.* Judges have been cautioned towards deference in their review of

attorney performance under *Strickland* claims in order to "eliminate the potential distorting effect of hindsight." *Rector v. Johnson*, 120 F.3d 551, 563 (5th Cir. 1997) (quoting *Strickland*, 104 S.Ct. at 1065). Accordingly, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The second prong requires the petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 104 S.Ct. at 2055–56. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 2056. In other words, the petitioner must show prejudice great enough to create a substantial, rather than conceivable, likelihood of a different result. *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011) (quoting *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011)).

"Both of [Strickland's] prongs must be proven, and the failure to prove one of them will defeat the claim, making it unnecessary to examine the other prong." *Williams v. Stephens*, 761 F.3d 561, 566–67 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1735, 191 L. Ed. 2d 706 (2015). However, we will also examine whether the cumulative effect of any prejudice found could satisfy *Strickland*. *E.g.*, *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009).

### 1. *Failure to investigate and/or discover information on the alleged victim*

The petitioner first alleges that Jordan conducted an inadequate investigation into the victim and her cognitive disability. Namely, he points to Jordan's failure to request any subpoenas relating to the victim's medical history or school records.

It is well settled that a strategic choice by trial counsel "after thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable . . . ." *Strickland*, 104 S.Ct. at 2066. However, "strategic choices made after less than complete investigation are reasonable

precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations **or to make a reasonable decision that makes particular investigations unnecessary**." *Id.* (emphasis added).

Jordan testified on his performance in this case twice – at a February 2011 hearing on the defense's motion for a new trial ("post-trial hearing") and at the October 2014 evidentiary hearing on the petitioner's application for post-conviction relief ("PCR hearing"). The motion for a new trial was brought by appellate counsel. *See* doc. 9, att. 3, pp. 139–50. There the petitioner asserted, among other allegations, that he had only learned after the trial that the victim had a cognitive disability. *Id.* at 140–41, 144. He also contended that the rape allegations were made as part of an attempted scheme by the victim's mother and her (the mother's) boyfriend, John Sampy, to extort money from the petitioner, and that the victim's disability made her easily influenced by these adults. *Id.* at 141–45.

At the post-trial hearing the defense reviewed, apparently for the first time, school board records on the victim's cognitive disability. Doc. 1, att. 12, pp. 32–33. Jordan testified that he had filed discovery motions and requests for exculpatory information, as well as a request for supplementation of responses.[4] *Id.* at 38–41. He went on to describe, at great length, the information received and his process in reviewing it. *Id.* at 39–60; doc. 1, att. 13, pp. 1–11. He then stated that he "was not informed that the alleged victim's mental capacity was relevant to, or an issue in the rape" and that he "was never informed ahead of trial that [L.R.] may have some cognitive disability." Doc. 1, att. 13, p. 12. He stated that he first learned of issues relating to the victim's disability when the victim's mother testified at trial that the victim was "mentally handicapped" or "slow." *Id.* at 14. He also stated that, had he known about the disability and the

---

[4] The defense stipulated that the school records were also newly discovered by the state. Doc. 1, att. 12, pp. 33–35.

-10-

potential role of Sampy in the victim's household, he "probably would have wanted to be prepared for [those issues] and may have issued subpoenas to try to get records about that."[5] *Id.* at 12.

At the PCR hearing, however, in response to a question on why he had not sought discovery in this matter, Jordan replied: "She was slow. It was going to be obvious to the jury that she was challenged. What was I going to do with those records? I already knew she was challenged." Doc. 1, att. 15, p. 25. He indicated that his focus at trial was on impeaching her credibility by showing discrepancies in the accounts of the rape given by the victim to various witnesses:

> Now, rather than throwing up some school records showing that she was mentally challenged, to me as a lawyer, it was going to be a whole lot more effective to the jury to show . . . that she couldn't even keep her stories straight, that she gave the SANE nurse one story, she gave the detective an entirely different story, and when she testified in front of the jury, she gave a third story.
>
> Now, don't you think that that's a lot more effective in a comprehensive way to show that there's reasonable doubt as to whether this challenged young lady is telling the truth about her accusations than subpoenaing some school records?

*Id.* at 26. On cross-examination he added:

> And I just want to preface my answer with this, when you're dealing a little girl, a fifteen . . . year old girl, you'd better be kind of careful. You don't go in there and beat up a little mentally challenged fifteen . . . year old girl. It's not the way to defend the case.

*Id.* at 44.

Jordan stated that he had limited documentation of the investigation he had done on the victim's background but that he had conducted interviews with people who knew the victim, including her mother, grandparents, best friend, and another employee at the petitioner's

---

[5] Jordan also admitted at this hearing that he had reviewed the records of the victim's sexual assault examination prior to trial, and that the examiner's notes clearly stated that she found the victim to be cognitively delayed. Doc. 1, att. 13, pp. 36–37. However, he stated that he believed this finding was only in relation to the trauma of the sexual assault rather than reflecting any assessment of the victim's general functioning. *Id.* at 37.

restaurant.[6] *Id.* at 5–16, 44–45. He admitted that his interview with the victim's mother was brief and focused on obtaining phone records. *Id.* at 5–16. However, he also detailed other efforts to find discrepancies that might discredit the victim, such as the fact that she talked with her best friend for an hour soon after the encounter but never mentioned that she had been raped and the fact that she alleged being locked in the room by the petitioner, despite the fact that the doors to that room did not lock from the inside. *Id.* at 45–51.

As the petitioner points out, the two accounts show a discrepancy over when Jordan first became aware of the victim's disability.[7] Additionally, as the Third Circuit observed in his direct appeal, "it might have been prudent to have had more information regarding the victim" given that there were no witnesses and her credibility was at issue. *Dalcourt*, 2012 WL 1521465 at *9. However, the petitioner fails to show that the state courts' determination that he could not satisfy *Strickland* is contrary to or an unreasonable application of federal law. Jordan's testimony at the PCR hearing establishes a reasonable basis for limiting his investigation of the victim's disability, and so the petitioner cannot show that Jordan's performance was constitutionally deficient in this matter. On the second prong, to the extent that the petitioner claims that the victim's disability might have made her more susceptible to being a pawn in an extortion scheme, he has put forth no

---

[6] The petitioner contends that these representations should be disregarded "because the testimony was unsupported by any documentary evidence, even though such evidence was subpoenaed." Doc. 1, pp. 14–15. Namely, he points to Jordan's failure to provide recordings or notes of interviews. However, as the respondent points out, Jordan responded to the subpoena by bringing his entire file to the PCR hearing. Doc. 1, att. 15, p. 12. The petitioner alleges that, because these documents were not made a part of the record, they should not be credited as supporting Jordan's testimony or the weight accorded to same by the trial court. We disagree. The documents were produced and described at the hearing (to the best of Jordan's ability, in light of repeated interruptions from petitioner's counsel). *See id.* at 4–12. The petitioner presents nothing to undermine the deference that the trial court's finding of credibility should be afforded in this matter.

[7] We note here that the hearings were over three years apart. Additionally, Jordan's later statements could easily reflect a general awareness that the victim was or had a reputation for being "slow" but that he had no knowledge that she was diagnosed with a specific cognitive disability. Accordingly, the apparent discrepancy does not persuade us Jordan was being untruthful in his testimony at either hearing.

evidence to support that theory of his case and show that it might have proven persuasive at trial. Accordingly, the petitioner is not entitled to federal habeas relief under this claim.

### 2. *Failure to interview the victim's mother and investigate John Sampy*

The petitioner next points to Jordan's failure to interview the victim's mother, F.R., and investigate her boyfriend, John Sampy. He contends that Sampy, who lived in the same household as the victim, was an extremely important witness and that identifying Sampy as the perpetrator or showing that Mr. Sampy had attempted to extort money from the petitioner relating to the victim's allegations would have benefited the defense. He also argues that further interviewing F.R. was deficient performance because she could have provided more information on Sampy.

As stated *supra*, Jordan stated that he only spoke with F.R. briefly and that his focus was on obtaining phone records. Doc. 1, att. 15, pp. 5–16. At the post-trial hearing he admitted that he was aware of Sampy and his potential importance to the case:

> Q: . . . . Why is John Sampy important in this case?
>
> A: John Sampy was an adult living in the household of [F.R.] with . . . [L.R.]. And he is the person who [F.R.] said went to the hospital with them, also called Kevin Dalcourt from the hospital and then afterward and met with him. He –
>
> Q: So you met with him?
>
> A: So he was a person that may have influenced the testimony of [other child in household], may have influenced the behavior and testimony of [L.R.], may have been the reason F.R. wanted her child to get a birth control shot a week before. He was a person that the defense felt provided a reasonable hypothesis of innocence.
>
> Q: Didn't you also learn that he is a person who attempted to extort money from this defendant?
>
> A: I was told by my client and his wife that this man wanted money to take care – to make everything go away.

Doc. 1, att. 12, p. 54. However, he did not uncover Sampy's identity until the trial. *Id.* at 58. At the same hearing, he admitted that he was introduced to F.R. by the prosecutor at a pretrial hearing. Doc. 1, att. 13, pp. 23–25. Though he had the opportunity to ask her for Sampy's name at that time, he did not do so then or at any point in the future. *Id.*

At the PCR hearing Jordan justified his failure to ask for Sampy's name at the pretrial hearing because he (Jordan) was "focused on the phone records," the basis for the continuance sought that day. Doc. 1, att. 15, p. 16. He maintained that his failure to do any research to uncover Sampy's identity was sound trial strategy because he instead wished to use him as an "empty chair" on whom he could pin accusations at trial, without Sampy being there to answer. Doc. 1, att. 15, p. 64. He also stated that he was not focused on the extortion allegations and that he did not have any evidence for them or that Sampy had assaulted L.R. *Id.* at 65–66. However, he did use innuendo to raise these issues at trial. *Id.*

Leaving aside the question of whether the lack of investigation amounted to deficient performance, we note that the petitioner has not shown sufficient prejudice from this omission to satisfy *Strickland*'s second prong.[8] He has not located Sampy or provided any support, beyond his own self-serving and conclusory assertions, for theories through which investigation of Sampy would have provided evidence the defense could use to create reasonable doubt. Therefore, even if Jordan's decision not to investigate Sampy amounted to deficient performance, the petitioner has not shown a right to federal habeas relief under this claim.

---

[8] The petitioner insists that he has no greater burden of proof beyond the unsupported assertions in his petition. To this end he relies on *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003). There the Fifth Circuit ruled that failure to investigate an eyewitness was grounds for relief under *Strickland*. However, its finding that *Strickland*'s second prong was satisfied was supported by the fact that the eyewitness supplied an affidavit stating that the petitioner was not at the scene of the crime and that he (the eyewitness) would have testified to this fact if called as a witness at trial. 338 F.3d at 385, 393–94. The petitioner makes no argument that he could provide further support for his claims, nor that he would be entitled to do so at this stage of the proceedings.

### *3. Failure to interview SANE nurse before stipulating to her expertise*

Finally, the petitioner claims that Jordan rendered ineffective assistance by stipulating to the expertise of Christa Billeaud, a Sexual Assault Nurse Examiner ("SANE") who testified for the state. The petitioner contends that, as Billeaud's testimony provided the only support for the notion that there was physical evidence of assault, trial counsel ought to have interviewed her before the trial and "develop[ed] a basis for excluding her opinion testimony . . . ." Doc. 1, p. 21. In particular, he points to an exchange on cross-examination as proof that, had Jordan done more investigation of Billeaud's opinions, he could have had her testimony excluded as unreliable through a *Daubert* motion.[9]

At trial Billeaud provided her background in nursing and her qualification as a SANE. Doc. 9, att. 5, pp. 207–09. She testified that a SANE is a "specially trained registered nurse . . . trained in the forensic medical exam and to assess sexual assault injuries and . . . to preserve and collect biological, trace and physical evidence." *Id.* at 208. She also stated that she was certified as a SANE for pediatric, adolescent, and adult patients, and that she had conducted over 150 sexual assault examinations. *Id.* at 208–09. Billeaud was then offered and, following traversal, accepted "as an expert in the field of sexual assault examiner." *Id.* at 209–15.

As physical evidence of the assault, the state used Billeaud's testimony to point to the presence of five small lacerations on the victim's anus. *See* doc. 9, att. 6, pp. 44–46. The petitioner contends that Billeaud was the only person to testify to the existence of the lacerations.[10] The

---

[9] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court provided the following non-exclusive criteria for trial courts in weighing the admissibility of expert testimony: (1) the "testability" of the scientific theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted in the scientific community. 113 S.Ct. 2786, 2796–97 (1993). The Louisiana Supreme Court characterizes the *Daubert* factors as "observations" that provide a "helpful guide for our lower courts in considering this difficult issue [of expert testimony admissibility]." *State v. Chauvin*, 846 So.2d 697, 701 (La. 2003).

[10] As Billeaud testified, lacerations and tears are synonymous in her descriptions of the injury. Doc. 9, att. 6, p. 48.

photograph of the area was blurry and, based on Billeaud's testimony, it appears that only two of the lacerations were visible there. *Id.* at 46–47. Yet Joseph Pearson, a medical doctor, also examined the victim. *Id.* at 105–07. He testified for the defense as an expert in emergency medicine. *Id.* Despite the petitioner's contention that Billeaud was the only person who saw the lacerations and that they could not be identified from her photograph, Pearson agreed that the photograph depicted tears to the victim's anus. *Id.* at 109–12. Pearson testified that the injury could be consistent with anal penetration, as well as non-sexual forms of trauma. *Id.* at 109–12. Billeaud, on the other hand, testified that three or more lacerations in that area were consistent with "probable forced penetration." Doc. 9, att. 6, pp. 47–48. She stated that that rule was taught to her in a training conducted by Dr. Linda Ledray, who wrote operational guidelines for the Department of Justice. *Id.* at 50. Billeaud did not know of any further source for the rule or the extent to which it was accepted in the scientific community. *Id.* at 50–51.

     At the post-trial hearing Jordan stated that he thoroughly reviewed Billeaud's report before the trial, but made no effort to discuss the report with her prior to the trial. Doc. 1, att. 13, pp. 36–37. At the PCR hearing he explained that he did not have an expert opinion from Billeaud and did not believe that the documents provided gave him sufficient basis for a *Daubert* challenge. Doc. 1, att. 15, pp. 18–19, 21. However, he did have her report and other documents relating to her examination. *Id.* at 18–19. He made no effort to contact Billeaud before the trial because he did not think that she would talk to him. *Id.* at 20. On cross-examination he added that he had contacted the victim's advocate, the examining physician (Pearson), and other personnel listed on Billeaud's report. *Id.* at 56–57. He stated that Pearson's opinions were consistent with Billeaud's on all points except for the existence of likely alternate explanations for the tears. *Id.* at 57–58.

Jordan admitted that he had been under the mistaken belief that a sexual assault nurse examiner "was like an officer of the court" rather than "a retained expert for the State."[11] *Id.* at 22. However, he maintained that, in his experience, it was better to stipulate to a witness's expertise "and then try to poke a hole in her testimony" in order to create reasonable doubt, and that he "did a heck of a job cross-examining her on the witness stand." *Id.* at 17, 20.

The petitioner cannot satisfy either of *Strickland*'s prongs with respect to this claim. Despite Jordan's mistaken belief on the role of sexual assault nurse examiners in the investigation, he was prepared to cross-examine Billeaud, to highlight the lack of documentation for her opinion on the significance of the lacerations, and to offer testimony from a defense witness that further weakened this assertion. Therefore Jordan's failure to interview Billeaud does not amount to constitutionally deficient performance.[12] Moreover, though Billeaud could not identify at trial the ultimate source of the rule she had learned, there is no indication that she would have been able to do so if subjected to a *Daubert* challenge. Accordingly, the petitioner has not shown any merit to a potential challenge to her testimony and cannot establish prejudice in satisfaction of *Strickland*'s second prong. He therefore shows no right to federal habeas relief under this claim.

---

[11] The petitioner also points to Jordan's concurrent admission that he did not know the difference between the terms "anal" and "rectal." Doc. 1, p. 24. However, he does not show how Jordan's confusion on this issue could have led to any confusion on the part of the jury on the strength of the experts' opinions on the meaning of the lacerations.

[12] The petitioner cites *Anderson v. Johnson*, 338 F.3d at 391, and *Bryant v. Scott*, 28 F.3d 1411, 1419 (5th Cir. 1994), for the proposition that "even an effective cross-examination cannot cure the failure to interview a witness before trial." Doc. 1, p. 23. However, the claims in *Anderson* and *Bryant* specifically related to the attorney's failure to interview eyewitnesses. In both cases it was determined that trial counsel's performance was constitutionally deficient because he relied exclusively on the state's investigative work in preparing for these witnesses rather than conducting his own investigation. Here, on the other hand, Billeaud testified as an expert and the record establishes that Jordan prepared by reviewing her report, procuring his own expert witness, and interviewing other personnel listed on Billeaud's report. Therefore Jordan's failure to interview Billeaud does not show the same lack of preparation or otherwise deficient performance found in *Anderson* and *Bryant*.

### *4. Cumulative effect of prejudice*

In this case we have only found one potential instance of deficient performance, under the claim relating to failure to investigate Sampy. Therefore it would be impossible for the cumulative effect of this error to satisfy *Strickland*'s second prong when it did not do so in isolation. The petitioner cites the fact that he was convicted by a vote of 10-2 as support for the proposition that the case against him was weak and prejudice flowing from any of counsel's errors ought to be more readily acknowledged. However, the margins of the petitioner's conviction are insufficient to overcome his total failure to provide any evidence for his allegation of prejudice from failure to investigate Sampy. Accordingly, the petitioner does not show a right to federal habeas relief under any theory of cumulative error.

## IV.
### CONCLUSION

Based on the foregoing, **IT IS RECOMMENDED** that the instant application be **DENIED** and **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file any objections with the Clerk of Court.  Timely objections will be considered by the district judge prior to a final ruling.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429–30 (5th Cir.  1996).

In accordance with Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. *See* 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

THUS DONE this 15th day of November, 2016.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE